Good morning, Your Honors. Michelle Villasenor Grant, Federal Defender, San Diego, on behalf of the Defendant Appellant, Mr. Torres-Jimenez. Your Honors, in this case, the District Court erred in two areas, first in failing to give the requested necessity instruction, and second in failing to suppress the statements that Mr. Torres-Jimenez made while in the field or in the parking lot at the time of his arrest. Your Honors, as to the necessity defense instruction, there was sufficient evidence shown to require the District Court to give the necessity defense instruction that was requested. However, the District Court found that there was not sufficient evidence, and this was an erroneous finding by the District Court. The evidence that was presented to the District Court was that the fires that gave rise to Mr. Torres-Jimenez entering the United States had been raging for about three days at the point of his arrest, which was October 28th. And that is on the record at 72 to 73 and 76. And on page 80 of the record, the agent did state that the fires were, in fact, at one point in Mexico. Upon his arrest, Mr. Torres-Jimenez was covered in ash, predominantly from his waist down, but he was, in fact, covered in ash. He did, they did find some bruises and cuts on his feet. And he had stated, at pages 76 to 77, Mr. Torres-Jimenez, in fact, stated to the agents that he had crossed through the fire area. And again, he made that statement when he was questioned again at the Border Patrol Station. He stated that he had crossed through the Otay Mesa area, which is where the fires, in fact, had started, just a few hundred yards from the border. Is there a city on the other side? Was he coming from an area that was, that was inhabited in Mexico? That's not in the record. And honestly, I think that entire area is just desert. Well, wouldn't that be relevant to the question of necessity as to whether he was driven into the United States by wildfires in Mexico if he was in an uninhabited area of Mexico? Well Does it have to explain why he's in an uninhabited area of Mexico on the U.S. border and being driven by wildfires? Not necessarily. There's He's running into the wildfire. That would have been the argument that the government could have made in closing argument. If the district court did, in fact, make, give that necessity defense instruction, then this is what would probably would have been argued to the jury. But Well, you have to make the proper, don't you, on necessity? Yes. And doesn't this, before they even get to argue it, or have to argue it, don't you have to show that there's some logic to it? Yes. There has to be at least some evidence of each of the four factors. And, but there have been cases which have held that that evidence can be inconsistent or weak or even doubtful as to whether that the evidence is sufficient for the jury, at least. But because there was at least some evidence, and that's what's been found to be required, then that is why the necessity defense should have been given. But some evidence. I mean, he's got to come forward with some kind of proper evidence that he was compelled to violate the law. That's what the necessity defense is, is that you're in circumstances in which you have two choices that are unacceptable, one of which is I must violate the law in order to preserve life or do something else. Correct. And if he's coming from an uninhabited area of Mexico across the desert and he's on the U.S. border and there are wildfires there, he's got to be able to explain why he couldn't go the other direction. Well I don't want to concede that it's an uninhabited area. That's just my belief. There is nothing in the record to indicate either way. And perhaps that's something that should have been gotten into at the district court, but the record seems to be completely silent as to that issue. Whose fault is that? I believe that it's both of ours, actually. If I had known one way or the other and it was beneficial to my client, I should have put it into the record, obviously into my proffer. But as far as I can recall, I don't think that I knew at the time either. But I think that, again, as I was stating, there was some evidence and that is what this court has required as necessary. And I think that the district court should have at least allowed the defense to argue to the jury about that issue and was not able to. The second issue is as to the statements that were made in the parking lot. And really the only issue as to that is whether Mr. Torres Jimenez was in custody when he was approached by the two Border Patrol agents. And I think there's a number of factors which show that he was. First, the two agents approached in their Border Patrol vehicle. They were across the street and they were looking towards a gas station and, like, a convenience store area, and they saw Mr. Torres Jimenez and a group of about 15 to 20 people. When the agents looked to Mr. Torres Jimenez, he moved away from the group and tried to basically hide behind a truck. And that was at ER 69 is where the agents stated that that's why he became suspicious of Mr. Torres Jimenez. They drove over to that area. Both agents exited the vehicle and they began to approach Mr. Torres Jimenez. And that's where they noticed the as they were walking towards him, they noticed that he was kind of looking away and trying to turn away from them and, in other words, avoid them. But they still continued to approach him. And then that's when they asked him how he was doing. He didn't respond intelligibly. They asked him again. And then they asked him. And then at least one agent, Agent Collier, I believe only, he was asking the questions, asked him what his citizenship was. And I think given the fact that the two agents approached him and he was trying to basically avoid them, it kind of shows that he felt compelled to talk to them. In all of the cases cited by the government, the main point of them is that at any time the people who were approached could have walked away. And this isn't that type of instance because as they were approaching, he was trying to avoid them, trying to look away from them, but they still approached him, came upon him at all times or within a few feet of him. That's not exactly the way we treat ordinary Terry Stotts. If an officer stops you because he has reason to believe that the law may have been violated, you're not free to just pick up and walk away. That doesn't mean that you've been detained in the sense of being arrested, but you do have an obligation to speak to the officer. Right. But I think that what the government was arguing is that it was a consensual encounter and not a Terry Stott. If it was a Terry Stott, then the district court would have had to make findings as to reasonable suspicion for the officers to approach and to speak to Mr. Torres Jimenez. And the first question that they asked, how are you doing, was obviously not interrogation. They were inquiring as to his health because of the situation that had been going on in the San Diego area and in the border area for those three days. But thereafter, when they asked the citizenship question, that's when interrogation begins. And I think that given the situation that there were two agents and he was separated from the group of people that he was either with or near at the time, and just across the way there's four other Border Patrol agents, Border Patrol cars, many other agents, sheriffs, and just a lot of other police activity going on, I don't think there's any way that he would have felt free to leave and would have felt compelled to answer their questions. Yeah. You've covered all this, and you're free. Thank you. Do Your Honors have any questions about anything else? Thank you. Thank you. Good morning, Your Honors. My name is Richard Chang. I was the government trial counsel. I'm from San Diego. Here's the problem. No doubt that there were a lot of people at that particular location. This was, in fact, the ad hoc command center for the sheriffs for Border Patrol in order to address the issues of the fire. Located just across the street from this command post, there were about 15 to 20 people essentially just gathered, and there was one person that stood out to Agent Kilari, and that was a person who was covered in ash only from the waist down. Recall, this is the third and final day of the fire. All the fires pretty much happened out, and more importantly, the direction of the fires were never, ever from south or from Mexico into the United States. If anything, Agent Kilari said, you know, these are raging on the San Diego area going southbound at most. So for this individual to have supposedly going north, he's going into the belly of the beast. Why would someone trying to escape from the fires go toward the fires? And that is the critical problem in this particular request for necessity defense. This isn't an issue of whether there was just some evidence that was put forth. The jury has to have evidence, or the judge has to decide whether there is a sufficient amount of evidence for a reasonable jury to not only decide on, you know, whether the information is credible, but to answer four distinct questions. Was there a choice of evils? Was Mr. Torres-Jimenez faced with a situation whether he could go north or he could go south? And if he has to go one direction, it would mean death. If he has to go another direction, it would mean saving his life. There's absolutely nothing provided by the defense about that. Was the information or was the threat imminent? There's absolutely no – I appreciate your passion, but you've covered all of this. I appreciate that. I will move on to one item that I believe was not necessarily covered. I don't remember that phrase, belly of the beast. Let me just indicate that the fires during that time in San Diego certainly taxed the time, as well as the feelings, as well as the emotions of law enforcement, as well as, more importantly, the entire location. Could you address counsel's argument on the stop? Are you – she construes your argument as not advancing this as a Terry stop on reasonable suspicion, but rather just a consensual encounter? I think clearly at the very beginning, Agent Kolari would even agree that what goes through his mind at that time, he wasn't looking for aliens. His job at that time was not only being a Border Patrol agent, but also helping out in the fires. That's where he was on his way. When he was on his way, his partner and he sees, in fact, someone apparently covered in ash, at least waist down, distinguishable from anyone else. I understand that. What are you arguing? What I'm arguing, at first, Agent Kolari was just trying to figure whether he was all right. And, in fact, he asked, are you all right, in English and then in Spanish. When he didn't get any response, look at what Agent Kolari says. Where are you going, sir? Where are you coming from? And certainly when it was clear to Agent Kolari at that time that he was dealing with someone who possibly didn't understand English at an area that he is familiar with, then it became a situation in which he's adding up. Look, I saw some furtive movements. This person is trying to hide. He's not responding to my questions about – Are you arguing this as a Terry stop on reasonable suspicion or just consensual? I'm arguing both. At the beginning, it was consensual. Okay. And counsel said, well, under a Terry stop analysis, there are no findings of reasonable suspicion in the court below. I think that's accurate. Certainly, Judge Jones did not consider it that way. And at that point, what we're arguing and what the judge did here was Agent Kolari's first consensual encounter. Are you all right? Do you know where you are? Can I, in fact, get you some medical help? And that's what exactly happened in the very beginning. Certainly, however, we believe that as the encounter grew more and more informative for Agent Kolari, he decided, I may have a legal immigrant in my hands. And that's when those questions started flowing. I'll answer also any questions this Court may have regarding the Shepherd case and its applicability to the case at bar. There was a 28-J letter, and that's why the government is responding this way. The only applicability of the Shepherd case to the case at bar is it really narrows down or the U.S. Court indicates what particular documents are viable, what should the government use to prove up a prior conviction. Let me just indicate, we didn't use anything that is prohibited by Shepherd. We didn't use or go outside the record. We didn't use police reports. We didn't use anything that Shepherd was concerned about. What we did use was an abstract of judgment. What we did use were certified judgments and convictions that were specifically reviewed by the district court prior to its sentencing. What I think Shepherd is of concern possibly to the Court and certainly to the defendant is that in Justice Thomas' dissent, he is clearly notifying everyone that reads it that Almodores-Torres is or its continued viability of Almodores-Torres is severely in question. And certainly we understand that as well. But certainly as well, until and unless the Supreme Court changes it specifically and overrules Almodores-Torres in any particular way, that is still the law of the land. And in this instance, the law of the land states that a prior conviction can be determined and can be adjudicated by the judge at sentencing instead of being charged and proven in front of a jury. If there are any questions, I'm happy to answer those as well. Thank you. Thank you, Your Honors. Any rebuttal? Just one thing, actually. Well, two things, actually. The government just noted that Agent Kalleri first approached Mr. Torres Jimenez because he was covered in ash from the waist down. But the agent actually states that on ER-72, I first noticed as I approached, he appeared to be he had ash covering his body predominantly from the waist down. I asked him if he was okay. Now, if that, in fact, is a consensual encounter, nothing obviously harmful to Mr. Torres Jimenez arose from that. He didn't say anything that was used against him at that point. But it seems that Mr. Chang is arguing that it turned into a terri-stop-leg encounter or Agent Kalleri became aware that he was perhaps dealing with an unlawful immigrant. Yeah. And so if it became, if he became aware that he was an unlawful immigrant and then began asking those interrogation type questions, I think that's where you get into the issue. Did he at that point have reasonable suspicion to continue with those types of questions if it became a terri-stop encounter? Or was it as I'm I believe that given the case law that I've been looking into, it seems that you probably can. And unless your honors have any other questions, that's all. All right. Thank you very much. And the last matter on the calendar, U.S. versus Jesus Galvan Garcia, that's submitted. And the court will recess. All rise.
judges: Pregerson, Fisher, Bybee